UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.   CASE NO. 3:19-cr-188-J-34JBT

JOHN DOE, etc.
_____

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion to Suppress ("Motion") (Doc. 50) and the Government's Response thereto (Doc. 52). The undersigned held an evidentiary hearing and heard additional argument on September 2, 2020. (Doc. 60.) For the reasons set forth herein, the undersigned respectfully **RECOMMENDS** that the Motion be **DENIED**.

**I.   Background**

The Indictment (Doc. 1) charges Defendant with three counts of hampering his departure from the United States in violation of 8 U.S.C. § 1253(a)(1). The Government asserts that on April 17, 2019, June 20, 2019, and July 23, 2019, Defendant hampered his departure by refusing to answer questions that deportation officers asked him and by making allegedly false and/or inconsistent

---

[1] "Within 14 days after being served with a copy of the recommended disposition [of a motion to suppress evidence], . . . a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2). "Failure to object in accordance with this rule waives a party's right to review." *Id.*; *see also* 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

statements.  (Doc. 52 at 11 n.6, 13 n.7, 14 n.8; Doc. 60 at 65.)

Defendant now seeks to suppress the statements that he made to the deportation officers based on the officers' failure to provide him with *Miranda* warnings.[2]  The parties largely agree on the facts; the dispute primarily concerns the application of the law to the facts.  (Doc. 60 at 53.)  Defendant argues that the deportation officers who questioned him on the aforementioned dates knew or should have known that they were likely to elicit incriminating statements.  (*See* Doc. 50; Doc. 60 at 53–66.)  Therefore, *Miranda* warnings were required.  (*Id.*)  The Government argues that any statements made should not be suppressed because they did not concern prior crimes but instead constituted new crimes.  (Doc. 52 at 17–18; Doc. 60 at 59–61.)

## II.   Summary of Recommendation

The undersigned recommends that the Motion be denied for two separate reasons.  First, any statements made by Defendant were not confessional in nature but rather constituted new crimes.  Second, even if interrogation occurred for *Miranda* purposes, the questions posed by the officers fall into the "routine booking question" exception to *Miranda*.  Furthermore, the officers were not using the questions as a guise to obtain incriminating information.  Thus, any statements should not be suppressed.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

### III.     Summary of Testimony of the Government's Witness

At the hearing, the Government called one witness, Kenneth Keaton, who has been the deportation officer assigned to Defendant's case since March 2019. (*See* Doc. 60 at 5–53.)  Officer Keaton testified based on his personal knowledge and on information in Defendant's immigration files.  Defendant's first encounter with immigration authorities was on January 6, 1985, at which time he gave the name Freddie Davis.  (*Id.* at 8–9.)   Defendant was subsequently removed to Jamaica.  (*Id.* at 9.)  Defendant had other encounters with immigration authorities following his deportation, and in two of those instances he gave the name Joseph Gordon.  (*Id.* at 9–14.)  Defendant's case file indicated that he had been charged with crimes under different names, including Freddie Lee Davis, Noel Jones, Ricardo Jones, and Dave Davis, among others.  (*Id.* at 10–11, 13–14.)

Defendant came into Immigration and Customs Enforcement ("ICE") custody in June 2018, following his completion of a prison sentence.  (*Id.* at 14–15.)  At that time, Defendant was scheduled to be removed to Jamaica.  (*Id.* at 16.) ICE was trying to get the Jamaican consulate to issue a necessary travel document so that Defendant could be removed.  (*Id.* at 21–22.)  However, shortly after being transferred to the Baker County Jail in January 2019, Defendant spoke with the Jamaican consulate and stated that his name was Ricardo Jones and that he was from the U.S. Virgin Islands.  (*Id.* at 17, 21–22.)  The consulate did not issue the travel document because Defendant was asserting that he was a United States

citizen and there was no conclusive evidence that Defendant was a citizen of Jamaica.  (*Id.* at 22–23.)

On April 17, 2019, the date of the crime charged in Count One of the Indictment, Defendant refused to give biographical and family information to the Jamaican consulate.  (*Id.* at 25.)  On that same date during an interview with Officer Keaton, Defendant stated that his name was Ricardo Jones and his date of birth was July 25, 1963.  (*Id.* at 25–27.)

Officer Keaton and another deportation officer, Joseph Ordon, conducted a video-recorded interview with Defendant on June 20, 2019, the date of the crime charged in Count Two of the Indictment.  (*Id.* at 27–28; *see* Government's Exhibits 1 & 2.)  In general, Defendant was not cooperative in answering biographical questions during this interview, indicated multiple times that all the information sought was in the file, and requested an attorney several times.  (Government's Exhibit 2 at 4–9, 15–17.)  Defendant did state that his name was Freddie Davis and he acknowledged using several different names in the past.  (*Id.* at 16.)

Officer Keaton and Officer Ordon conducted another video-recorded interview with Defendant on July 23, 2019, the date of the crime charged in Count Three of the Indictment.  (Doc. 60 at 30; *see* Government's Exhibit 3 & 4.)  Again, Defendant was generally uncooperative, did not answer multiple questions, and asked several times for an attorney.  (Government's Exhibit 4 at 2, 4–7.)  He again claimed that his name was Freddie Davis, acknowledged using multiple names, and stated that his father was from the Virgin Islands.  (*Id.* at 4–6.)

Officer Keaton testified that during the foregoing interviews and in his earlier interviews with Defendant, he was seeking only biographical information "to provide to the consulate so they can maybe find a family member or – to issue a travel document." (Doc. 60 at 33.) He testified that "[t]he sole purpose [of the interviews] is to get him a travel document for his removal from the U.S." (*Id.*) Officer Keaton did not believe Defendant had the right to an attorney during the interviews because the officers were seeking only biographical information. (*Id.*) However, Officer Keaton would have allowed an attorney to be present had Defendant retained one. (*Id.* at 33, 46–47.) Officer Keaton further testified that had Defendant provided sufficient truthful biographical information so that a travel document could be issued, Defendant would have been removed from the United States and not criminally prosecuted. (*Id.* at 32–33.)

On cross-examination and redirect, Officer Keaton admitted his understanding that if Defendant had previously provided ICE officials with false names and places of birth, Defendant would have been committing the federal offense of providing a false statement to a federal agent. (*Id.* at 35–37.) Officer Keaton believed that Defendant's April 17, 2019 statement that his name was Ricardo Jones was a false statement, and therefore his later statements that his name was Freddie Davis could be used against him in a prosecution for lying to a federal law enforcement officer on April 17, 2019. (*Id.* at 47.) However, Officer Keaton was not certain of Defendant's true name and did not know whether it was Freddie Davis. (*Id.* at 49, 51.) The immigration files reflected that Defendant used

5

multiple names, and the name Freddie Davis was associated in the file with a driver's license photograph that was not of Defendant. (*Id.* at 51–52.) Moreover, "the purpose for the interview, was not to – for incrimination. It was . . . to gain biographical information so we can provide it to the consulate to get the travel document." (*Id.* at 48.)

### IV. Applicable Law

#### A. Fifth Amendment – Incriminating Statements v. New Crimes

"The Fifth Amendment provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' . . . Under the Fifth Amendment, statements a defendant makes during a custodial interrogation may not be used against him in court unless the government first advises the defendant of his rights as set forth in *Miranda v. Arizona*, 384 U.S. 436, 479 [ ] (1966)." *United States v. Woods*, 684 F.3d 1045, 1055 (11th Cir. 2012).

However,

> [t]he Fifth Amendment's prohibition against self-incrimination relates to crimes alleged to have been committed prior to the time when the testimony is sought. A person, uninformed of his rights, who testifies and thereby incriminates himself of a crime that has been committed, may assert a fifth amendment privilege if prosecuted for that crime, but it has been held that he is not free to falsely testify and commit perjury. . . . Thus, as a general rule it can be said that no fifth amendment problem is presented when a statement is admitted into evidence which is not confessional in nature, but in and of itself constitutes the crime charged.

6

*United States v. Kirk*, 528 F.2d 1057, 1061–62 (5th Cir. 1976) (citations omitted) (holding that the defendant's threat to kill the President communicated to secret service agents presented "no fifth amendment problem" because the statement "in and of itself constitutes the crime charged").

An instructive illustration of the above distinction in a similar case to the one at bar was presented in *United States v. Owuor*, 397 F. App'x 572 (11th Cir. 2010).[3] In that case, the defendant was in the booking area of a jail when ICE agents, present regarding unrelated persons, overheard his strong accent. *Id.* at 573. The agents asked the defendant where he was from and he replied that he was a United States citizen. *Id.* He also provided the agents with a social security number. *Id.* After the agents left, they ran the provided information through a database and learned that the defendant was born in Kenya and that he had provided a false social security number. *Id.* at 573–74. The agents returned to the jail and interviewed the defendant in a visitation room. *Id.* at 574. The defendant again stated that he was a United States citizen and made related statements. *Id.* After those statements were made, the agents gave the defendant a *Miranda* warning and stopped the interview. *Id.*

---

[3] Although unpublished Eleventh Circuit decisions are not binding precedent, they may be persuasive authority on a particular point. *See, e.g.*, *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive."). Rule 32.1 of the Federal Rules of Appellate Procedure expressly allows citation to federal judicial unpublished dispositions that have been issued on or after January 1, 2007. Fed. R. App. P. 32.1(a).

The defendant was subsequently charged with falsely representing himself to be a United States citizen, based solely on his statements in the visitation room. *Id.* Defendant argued that the statements he made during this interview should be suppressed because he was not given a *Miranda* warning until after he made the statements. *Id.* The court held that *Kirk* was controlling and that the "statements to the ICE agents in the visitation room were new crimes rather than statements that related to past crimes. Accordingly, there is 'no fifth amendment problem,' and the district court did not err in denying [the defendant's] suppression motion." *Id.* at 575 (citations omitted). *See also United States v. Doe*, Case No. CRIM. 12-0052, 2012 WL 5364269, at *8 (W.D. La. Oct. 1, 2012) ("[S]uppression of the un-*Mirandized* statements that ICE agents obtained from Doe, which presumably consist of his tireless refrain that he is Mark Hook from the U.K., is not warranted, as the statements either constitute separate instances of crimes, or otherwise form part of his ongoing scheme to prevent or hamper his removal."), report and recommendation adopted, 2012 WL 5364266 (W.D. La. Oct. 31, 2012).

### B. Interrogation Under *Miranda*

In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court defined "interrogation" for purposes of *Miranda* as follows:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police

8

> should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

*Id.* at 301–02.

In *Pennsylvania v. Muniz*, 496 U.S. 582 (1990), a plurality of the Supreme Court rejected the state's argument that routine booking questions did not qualify as "custodial interrogation" as defined in *Innis*. *Id.* at 601. However, as discussed in the next section, the Court nevertheless denied suppression of the responses to such questions based on the routine booking question exception to *Miranda* coverage. *Id.*

Although several Eleventh Circuit decisions use language suggesting that routine booking questions do not constitute "interrogation" for *Miranda* purposes, this language would appear to be inconsistent with *Innis'* inclusion of "express questioning" in the definition of "interrogation" and with the plurality opinion in *Muniz*. *See United States v. Doe*, 661 F.3d 550, 567 (11th Cir. 2011) ("Silva's request for Doe's biographical information in preparing a pretrial services report was not an interrogation for *Miranda* purposes. Rather, Silva's questions fell within the well-established 'routine booking exception' to *Miranda's* coverage for questions posed to the defendant 'to secure the biographical data necessary to complete booking or pretrial services.'"); *United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991) ("An officer's request for routine information for booking purposes is not an interrogation under *Miranda*, even though that information turns

9

out to be incriminating.") (quotations omitted); *United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983) ("We have held that requesting 'routine' information for booking purposes is not an interrogation under *Miranda*, even though that information turns out to be incriminating."). Thus, it appears the Eleventh Circuit has merged the separate issues of whether "interrogation" occurred and whether the routine booking question exception applies. This merger creates some uncertainty in the Eleventh Circuit regarding the definition of "interrogation." Nevertheless, the recommended result is the same in this case.

### C. Routine Booking Question Exception to *Miranda*

The "routine booking question" exception to *Miranda* "exempts from *Miranda's* coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.'" *Muniz*, 496 U.S. at 601. Thus, questions regarding a person's "name, address, height, weight, eye color, date of birth, and current age" for example, may constitute custodial interrogation but may still be admissible because they "appear reasonably related to the police's administrative concerns." *Id.* at 600–02. However,

> police may not use routine biographical questioning as a guise for obtaining incriminating information. If investigative questions are asked while routine information is being obtained . . . answers to such questions are inadmissible if the suspect has not been read his *Miranda* rights. Even questions that usually are routine must be proceeded by *Miranda* warnings if they are intended to produce answers that are incriminating.

*United States v. Glen-Archila*, 677 F.2d 809, 816 (11th Cir. 1982).

In *United States v. Glen-Archila*, the defendant was being interviewed by an immigration official and he provided the official with his home address in Colombia, which was used at trial as evidence that he was a member of a conspiracy to import marijuana into the United States. *Id.* The defendant argued that the statement should not have been admitted because he had not been given a *Miranda* warning prior to making it. *Id.* The court held that the question the defendant answered was "routine, biographical, and not intended to induce an incriminating response. [Therefore, a] *Miranda* warning was unnecessary." *Id. See also Doe*, 2012 WL 5364269, at *8 (finding that the routine booking question exception applied to the defendant's statements to immigration officials, because, among other things, "there is no indication that Agent Tyler sought any more information than necessary to establish Doe's identity and immigration status").

**V. Analysis**

    **A. The Fifth Amendment is Not Implicated**

The undersigned recommends that the statements Defendant made to the deportation officers during the three interviews "were new crimes rather than statements that related to past crimes," and accordingly "no Fifth Amendment problem is presented." *Owuor*, 397 F. App'x at 575; *Kirk*, 528 F.2d at 1062. As previously discussed, in *Owuor* the defendant was charged with falsely representing himself to be a United States citizen based on statements he made to ICE agents during an interview, even though the agents already suspected he had given false statements about his citizenship prior to the interview. *Owuor*, 397

11

F. App'x at 574. The court held that the statements he made during the interview "were new crimes rather than statements that related to past crimes." *Id.* at 575. Moreover, in a case factually similar to the case at bar, the defendant was charged with hampering his removal from the United States based on providing false information regarding his identity to immigration officials. *Doe*, 2012 WL 5364269, at *2. Although the court noted that the immigration officials may have suspected that the defendant was hampering his removal, the court found that the "statements either constitute separate instances of crimes, or otherwise form part of his ongoing scheme to prevent or hamper his removal." *Id.* at *8.

In this case, Defendant's statements, consisting primarily of his purported name(s) and limited biographical information, were not confessional in nature. Rather, they form the basis of the new charges, along with his lack of cooperation. As in *Doe*, his "statements either constitute separate instances of crimes, or otherwise form part of his ongoing scheme to prevent or hamper his removal." *Id.* Thus, just as a person is "not free to falsely testify and commit perjury," Defendant was not free to hamper his removal. *Kirk*, 528 F.2d at 1062. Accordingly, the undersigned recommends that Defendant's statements should not be suppressed.

### B.    Although Not Dispositive, Interrogation Likely Occurred

Based on the undersigned's reading of *Innis* and *Muniz*, it is recommended that interrogation occurred because of the officers' "express questioning" of Defendant. Nevertheless, as discussed in section IV B. herein, there is language in some Eleventh Circuit decisions indicating that routine biographical questions

do not constitute "interrogation" for *Miranda* purposes. Defendant's argument appears directed at those decisions. The problem with Defendant's argument, however, is that he equates "interrogation" with suppression. (Doc. 60 at 53–54.) But even if interrogation occurred, the statements may still be admissible under the routine booking question exception, which is what the undersigned recommends. Nevertheless, the undersigned will address Defendant's argument.

Defendant argues that, under an objective standard, the officers should have known that the biographical questions they were posing were reasonably likely to elicit incriminating information. (*Id.* at 53–55.) Defendant appears to argue that since he had used so many false names in the past, and since the officers knew that, any response to the biographical questions would incriminate him. (Doc. 50 at 5.) Defendant posits, for example, that since he gave the name "Ricardo Jones" on April 17, 2019, his "truthful" admissions on June 20, 2019 and July 23, 2019 that his name was "Freddie Davis" were incriminating because it showed he had given a false statement on April 17, 2019. (Doc. 60 at 64) (Defendant's attorney arguing the Government "is going to use his truthful statement against him in Count One"). The flaw in Defendant's argument, however, is that the officers did not know, and reasonably could not have known, how Defendant would respond or even what his real name was. Officer Keaton testified that he did not know what Defendant's true name was. (*Id.* at 49, 51.) (*See also id.* at 51, 65) (Government's attorney arguing "We don't know what his true name is. We have no idea.").

13

Precisely because Defendant had given so many different names in the past, and because Defendant's true biographical information was still a mystery, the officers did not know, and reasonably should not have known, that Defendant would provide any incriminating information. They had no reason to suspect Defendant would all of a sudden confess, or that he was vulnerable to providing information that was confessional in nature. On the contrary, the likelihood was that Defendant would continue his pattern of being uncooperative and providing unverifiable, inconsistent information. As previously explained, such responses are not incriminating but rather constitute new crimes. Accordingly, the undersigned recommends that Defendant's argument be rejected. Nevertheless, the undersigned recommends that "interrogation" did occur because of the officers' express questioning of Defendant. However, the undersigned still recommends denial of the Motion for the reasons discussed in sections V A. and V C. herein.

### C. Even if Custodial Interrogation Occurred, the Routine Booking Question Exception Applies

The undersigned recommends that the questions the deportation officers asked Defendant on April 17, 2019, June 20, 2019, and July 23, 2019 fall under the routine booking question exception, and therefore *Miranda* warnings were not necessary. *Muniz*, 496 U.S. at 601. In *Glen-Archila*, the court determined that questions asked regarding the defendant's address fell under the routine booking question exception because "[t]he question in response to which Glen-Archila gave his address was, we believe, routine, biographical, and not intended to induce an

14

incriminating response." *Glen-Archila*, 677 F.2d at 816. The undersigned recommends that the questions asked during each of the interviews in this case were similarly straightforward attempts to obtain Defendant's biographical information in order to complete his deportation.

There is no evidence to indicate that Defendant's April 17, 2019 interview with Officer Keaton served any purpose other than that of obtaining biographical information. It appears that the only question at issue during this interview was when Officer Keaton asked Defendant for his name, to which Defendant replied "Ricardo Jones." (Doc. 50 at 2; Doc. 52 at 10–11; Doc. 60 at 25–26.) Defendant also provided a date of birth. (*Id.*) The June 20, 2019 and July 23, 2019 interviews were similarly focused. Much of the June 20, 2019 interview involved the deportation officers telling Defendant that they were seeking only biographical information, and Defendant asking for an attorney and telling the officers they already had such information. (*See* Government's Exhibit 2.) When the officers began questioning Defendant about his biographical information, they asked only for his complete name and whether he had ever used any other names.[4] (*Id.* at 16.) He replied that his name was Freddie Davis and he acknowledged that he had used several different names. (*Id.*)

---

[4] Regarding the question whether Defendant had ever used any other names, a relevant biographical question, the officers asked no follow-up questions that might suggest that the officers were trying to get Defendant to admit to any crime, such as making false statements to a federal official.

15

During the July 23, 2019 interview, the deportation officers asked Defendant for, among other things: his full name, country of birth and citizenship, whether he had ever encountered immigration officials in the past or had been deported before, when and where he last entered the United States, whether he had been inspected by an immigration officer, his parents' names and dates of births, if he had a birth certificate and, if so, who was listed as his mother and father on the birth certificate, if his parents had ever divorced, and the citizenship of his parents. (Government's Exhibit 4 at 4–7.) Of these, the only questions Defendant answered were the questions about his name and where his father was born, stating that his name was Freddie Davis and his father was born in the Virgin Islands. (*Id.* at 4, 6.) He also again acknowledged using multiple names. (*Id.* at 4.)

The undersigned recommends that, as in *Glen-Archila*, the questions the deportation agents asked Defendant were "routine, biographical, and not intended to induce an incriminating response." *Glen-Archila*, 677 F.2d at 816. This case is also similar to *Doe*, wherein the court found that questions posed by immigration officials regarding the defendant's citizenship fell under the routine booking question exception to *Miranda* because "there is no indication that [the deportation officers] sought any more information than necessary to establish Doe's identity and immigration status." *Doe*, 2012 WL 5364269, at *8.

Moreover, Defendant does not persuasively argue, and there is no basis in the evidence to conclude, that the officers subjectively were using the biographical questions as a guise for obtaining incriminating information. (Doc. 60 at 53–54)

(Defendant's attorney incorrectly arguing it is "an objective standard"). Officer Keaton testified that during the interviews, he was seeking "the biographical information to provide to the consulate so they can maybe find a family member or -- to issue a travel document. The sole purpose is to get him a travel document for his removal from the U.S." (*Id.* at 32–33.) He additionally testified that had Defendant provided truthful information so that travel documents could be issued, Defendant would have been removed from the United States and not criminally prosecuted. (*Id.* at 33.) Moreover, he testified that obtaining incriminating information "wasn't the purpose of the [June 20, 2019] interview," but the purpose was to "to gain biographical information so we can provide it to the consulate to get the travel document." (*Id.* at 48.) Officer Keaton's testimony is further supported by Officer Ordon's multiple statements during the recorded interviews that the agents were not seeking incriminating statements but only biographical information. (Government's Exhibit 2 at 4, 9; Government's Exhibit 4 at 1, 4–5.) Accordingly, the undersigned recommends that no *Miranda* warnings were required because the questions asked during the April 17, 2019, June 20, 2019, and July 23, 2019 interviews fall under the routine booking question exception. Further, the questions asked by the deportation officers were not "intended to induce incriminating responses." *Glen-Archila*, 677 F.2d at 816. Thus, any statements should not be suppressed.

17

## VI.  Conclusion

The undersigned recommends that because the allegedly incriminating statements constituted new crimes and did not relate to past crimes, no Fifth Amendment problem exists.  In addition, even if the deportation officers' interviews with Defendant were interrogations, the routine booking question exception to *Miranda* applies.  Thus, the Motion should be denied.

Accordingly, it is respectfully **RECOMMENDED** that:

The Motion (**Doc. 50**) be **DENIED**.

**DONE AND ENTERED** in Jacksonville, Florida on September 30, 2020.

_____
JOEL B. TOOMEY
United States Magistrate Judge

Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record

18